J-S21029-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.H., MOTHER | : | |
| | : | No. 153 EDA 2024 |

Appeal from the Order Entered December 12, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000905-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.H., MOTHER | : | |
| | : | No. 154 EDA 2024 |

Appeal from the Decree Entered December 12, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000290-2023

BEFORE:  LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED SEPTEMBER 10, 2024**

R.H. (Mother) appeals from the decree terminating her parental rights to S.H. (Child), born in September of 2021, and the order changing Child's permanency goal to adoption.[1]  Mother's counsel, Gary S. Server, Esq.

---

[1] Father's parental rights to Child were terminated on the same date.  Father filed separate appeals from the goal change order and the termination decree, which we will address in a separate memorandum.

(Counsel) has filed an application for leave to withdraw and an *Anders*/*Santiago*[2] brief. After review, we grant Counsel's application to withdraw and affirm.

Briefly, on September 5, 2021, the Philadelphia Department of Human Services (DHS) received a General Protective Services (GPS) report indicating that Mother had given birth to Child and alleging that Mother had a history of untreated mental illness, smoked marijuana while pregnant with Child, and missed prenatal checkup appointments. As part of its investigation, DHS caseworkers determined that Father and Mother were living in a garage without working utilities. DHS filed an application for an order of protective custody (OPC) for Child on September 9, 2021. That same day, the trial court appointed Karen Deanna Williams, Esq., to act as Child's guardian *ad litem* (GAL) and legal counsel. *See* Order Appointing Counsel, CP-51-DP-905-2021, 9/9/21.

The trial court adjudicated Child dependent on September 29, 2021. DHS placed Child in a pre-adoptive kinship foster home, where she has remained throughout the underlying dependency matter. DHS filed a petition to involuntarily terminate Mother's parental rights on August 2, 2023. The trial court conducted a hearing on December 12, 2023.

---

[2] *Anders v. California*, 386 U.S. 738 (1967); *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009); *see also In re V.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending *Anders* to appeals involving the termination of parental rights).

At the hearing, DHS presented testimony from Edward McNichol, a Community Umbrella Agency (CUA) case manager, and Emily Saleema, Psy.D., a licensed psychologist who performed a parental capacity evaluation of Mother and made two supplemental reports.[3]  Mother testified on her own behalf.

Mr. McNichol explained that he had been the case manager for Mother for about four years, which predated Child being taken into the care of DHS. *See* N.T., 12/12/23, at 127.  At the time of Child's birth, Child had marijuana in her system and Father and Mother did not have appropriate housing for an infant because they were living in a garage without working utilities.  *See id.* at 127-28, 139.  Mother's single case plan objectives included visitation, parenting skills training, obtaining appropriate housing, maintaining housing, and mental health treatment.  *See id.* at 133, 135.

Mother had supervised visitation with Child once per week.  *See id.* at 129, 144.  As of March 2023, Mother attended thirteen out of thirty-seven possible visits for that year.  *See id.* at 144.  At one point, DHS moved supervised visitations from the DHS building to Child's foster mother's (Foster Mother) home to accommodate Mother's work schedule and transportation issues.  *See id.* at 144-45; *see also* Permanency Review Order, CP-51-DP-905-2021, 1/20/22, at 2.  On one occasion, Mother was inebriated when she

_____

[3] Dr. Saleema's reports were admitted, without objection, as DHS Exhibits 9, 10, and 11.  *See* N.T., 12/12/23, at 9, 87.

arrived at Foster Mother's home for visitation. *See* N.T., 12/12/23, at 135, 146. After that, supervised visitation was moved back to the DHS building. *See id.* at 146; Permanency Review Order, DP-905-2021, 5/5/23, at 2. Mother's training in parenting skills occurred during her periods of supervised visitation, both with Foster Mother and with DHS. *See* N.T., 12/12/23, at 145-46. Mother did not complete her parenting skills training. *See id.* at 147. During Mother's periods of supervised visitation, Child would cry upon being separated from Foster Mother, and Mother would have to spend five to twenty minutes calming Child down. *See id.* at 130, 137. When Foster Mother picked up Child from Mother's periods of supervised visitation, Child would run to Foster Mother and call her "mom" and "mom-mom." *See id.* at 137.

During this dependency case, Mother and Father moved from Philadelphia to York, Pennsylvania. *See id.* at 140. Mr. McNichol inspected their home and advised them that there were several hazardous conditions in the home that they had to address to make it safe for a baby, including moving dangerous items such as carpentry nails and pill bottles out of the open where a child could reach them, removing clutter in the home such as power tools, buckets of water, books, and boxes of food, and placing barriers to separate their dogs from areas where a child would be. *See id.* at 140, 148-49. Also, Mother was residing with her brother-in-law, who was not cleared to reside with Child because he had a criminal record. *See id.* at 141-42. Mother was later evicted from that residence. *See id.* at 140, 142, 152. Mother moved

into another residence in York. **See id.** at 141-42. Mother admitted to Mr. McNichol that one of the other people living in that home sold illegal drugs. **See id.** at 143. The landlord of Mother's second residence in York had commenced eviction proceedings against Mother. **See id.** at 143, 152-53.

Mother has been terminated from three or four jobs during the time Child has been in the care of DHS. **See id.** at 144, 153; **see also** DHS Exhibit 9 at 9 (Mother was unemployed from December 2021 through a least July 2022, and she had last worked at a warehouse for an online retailer but quit before a new owner could terminate Mother's employment); DHS Exhibit 11 at 4-5 (Mother was terminated from an unspecified night shift position in January of 2023).

Mother was receiving mental health treatment at True North, but she was eventually discharged due to her failure to attend scheduled sessions. **See** N.T., 12/12/23, at 134, 150. Mother then enrolled for treatment at WellSpan Counseling Services, but they also discharged Mother because of non-attendance. **See id.** at 134.

On or about November 6, 2023, Mother told her therapist that if her parental rights to Child were terminated, she would put on a bomb vest and blow up the DHS building. **See id.** at 96-97, 132. York Police Department officers took Mother to a hospital and Mother was involuntarily committed under Section 302 of the Mental Health Procedures Act[4] on November 7, 2023.

_____

[4] 50 P.S. § 7302.

*See id.* at 97, 132. Upon Mother's discharge from the hospital on November 14, 2023, she was incarcerated in York County on charges of conspiracy and receiving stolen property. *See id.* at 132, 151. As of the date of the termination of parental rights hearing, Mother was still incarcerated. *See id.* at 132, 154.

Mr. McNichol concluded that Mother's compliance with her plan objectives was minimal, that she had not made progress towards alleviating the conditions that resulted in Child being brought into care, and that Child could not be safely returned to Mother at the time of the hearing. *See id.* at 135-36.

Mr. McNichol testified that Foster Mother and Child have a parent-child bond and Child looks to Foster Mother for emotional support. *See id.* at 137-38. Foster Mother provides for Child's physical needs and provides Child with a stable home environment. *See id.* at 138. Foster Mother is willing to adopt Child. *See id.* Mr. McNichol believes that it is very important that Child have a stable home environment and that adoption is in Child's best interest. *See id.*

Dr. Saleema interviewed Mother on July 7, 2022, for a parental capacity evaluation. *See id.* at 90. Dr. Saleema diagnosed Mother with unspecified bi-polar disorder, unspecified depressive disorder, unspecified trauma and stressor related disorder, panic disorder, and moderate cannabis use disorder. *See id.* at 103-04, 110; DHS Exhibit 11 at 7-8. Dr. Saleema could not conclusively diagnose Mother with borderline personality disorder. *See* N.T.,

- 6 -

12/12/23, at 104; DHS Exhibit 11 at 8. Dr. Saleema explained that she was concerned about Mother's level of insight and judgment regarding her mental health treatment, including medication. *See* N.T., 12/12/23, at 90. At the time of the evaluation, Mother was taking psychotropic medication as directed. *See id.* at 92, 94, 107-08. Mother also agreed to abstain from marijuana use, even prescribed medical marijuana, to comply with DHS's plan objectives. *See id.* at 90-91, 106-07. However, Mother informed Dr. Saleema that she believed that she did not need the psychotropic medication in the long term, did not like the side effects of the medication, and believed that the medication made her more amenable to being controlled by others. *See id.* at 92, 103. Mother also expressed her intent to cease taking medication after DHS's involvement with her family ended. *See id.*

Dr. Saleema completed the first addendum to her evaluation in January 2023 using Mother's mental health records from True North dated May 2022 to about November 2022. *See id.* at 93-94. Dr. Saleema concluded that Mother's progress with her mental health at that time was encouraging. *See id.* at 93-95, 108. However, Dr. Saleema was cautious about Mother's long-term stability based on Mother's history and could not conclude that Mother would continue with this level of treatment if she was not under the supervision of the court, DHS, and CUA. *See id.* at 95; DHS Exhibit 10 at 7-8.

Dr. Saleema completed the second addendum to her evaluation in May 2023 using records from True North through the end of February 2023. *See*

N.T., 12/12/23, at 95. She described those records as "less encouraging" than those from the previous seven months. *See id.* at 95-96. In January and February of 2023, Mother was experiencing increased stressors in her life, including Father's incarceration, and financial difficulties. *See id.* at 96. Mother experienced a "mental health crisis which included suicidal ideation." *See id.* Mother also resumed purchasing medical marijuana even though she was facing eviction from her home for failing to pay her rent. *See id.* at 91-92, 96; DHS Exhibit 11 at 5, 7. Dr. Saleema explained that while Mother "has the ability to recognize when she's stressed. I do not believe that [Mother] has the coping skills to effectively manage those situations at this time." *See* N.T., 12/12/23, at 102. Although Dr. Saleema had not discussed Mother's remarks about using a bomb vest to blow up the DHS building and Mother's subsequent involuntary commitment under Section 302 with Mother, Dr. Saleema opined that this was not a "responsible response" to a stressor. *See id.* at 116, 121, 123.

Dr. Saleema opined that Mother did not have great insight into why Child was taken into DHS care because Mother did not believe DHS's reasons for initiating dependency proceedings were valid and considered DHS's involvement with Child to be based on a prior matter involving Mother's other children. *See id.* at 92-93. Dr. Saleema expressed concern about Mother's "ability to identify potential safety risks" to Child and to "make sound decisions," and to solve problems in the future involving Child's physical safety. *See id.* at 93.

Dr. Saleema concluded that Mother needs long-term stability to reach the ability to parent Child by herself and that Mother lacked parental capacity at the time of the hearing. *See id.* at 97-98, 101, 122.

Mother testified that as of the date of the hearing she was incarcerated in York County. *See id.* at 154. Mother explained that she had been working on remediating the safety concerns at her residence in York before she was evicted from that home. *See id.* at 158-59. Mother testified that when she is released from incarceration, she would return to Philadelphia and complete intake for placement in a homeless shelter. *Id.* at 160-61.

At the conclusion of the hearing, the trial court terminated Mother's parental rights to Child pursuant to Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act,[5] and changed Child's permanency goal to adoption.

Mother timely appealed and simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). In lieu of a Rule 1925(a) opinion, the trial court issued a notice of compliance with Rule 1925(a) in which it referred to sections from the notes of testimony where the court stated its reasons for terminating Mother's parental rights on the record.[6] *See* Trial Ct. Rule 1925(a) Notice, 2/23/24, at 1-2 (unpaginated).

---

[5] 23 Pa.C.S. §§ 2101-2938.

[6] We emphasize that our standards of review require deference to the trial court's findings of fact and credibility determinations and that, generally, this

*(Footnote Continued Next Page)*

On appeal, Counsel has filed a petition to withdraw and an *Anders*/*Santiago* brief that identifies the following issues:

1. Is there anything in the record that might arguably support the appeal that obviates a conclusion that the appeal is frivolous and that would support the Mother's contention that there was not clear and convincing evidence justifying the court's decrees to terminate her parental rights under the Adoption Act and to change the goal to adoption?

2. Whether the trial court abused its discretion by involuntarily terminating the Mother's parental rights under Sections 2511 (a)(1), (2)[,] (5)[,] (8) and 2511(b)?

*Anders*/*Santiago* Brief at 6 (some formatting altered).

## Child's Legal Counsel

Initially, before we consider the issues Counsel identified in his *Anders*/*Santiago* brief, we must review *sua sponte* whether the trial court appointed legal counsel to represent Child for the termination proceedings pursuant to 23 Pa.C.S. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Our Supreme Court has interpreted Section 2313(a)

_____

requires the filing of an opinion pursuant to Pa.R.A.P. 1925(a). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (noting that "there are clear reasons for applying an abuse of discretion standard of review in [dependency and termination of parental rights] cases" and acknowledging that "unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents" (citations omitted)); *see also In re S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) (emphasizing that "[w]hen a trial court makes a 'close call' in a fact-intensive case . . . the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court").

"as requiring that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome." ***Id.*** (citation omitted and formatting altered). Additionally, the failure to appoint a "separate attorney to represent the child's legal interests constitutes structural error, meaning it is not subject to a harmless-error analysis." ***Id.*** (citations omitted and formatting altered).

It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." ***Id.*** at 1236 (citation omitted). As such, our Supreme Court has held that **before** appointing an individual to serve as both guardian *ad litem* (GAL) and legal counsel for a child, the trial court "must determine whether counsel can represent the dual interests . . . ." ***Id.*** Further, where the trial court appoints one attorney "to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the [trial] court made a determination that those interests did not conflict." ***Id.*** at 1235.

However, our Supreme Court has also held that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously." ***In re T.S.***, 192 A.3d 1080, 1088 (Pa. 2018) (citations omitted).

The ***T.S.*** Court explained:

The parties agree that, due to the children's very young age (two and three years old), they cannot have formed a subjective, articulable preference to be advanced by counsel during the termination proceedings, and this is entirely consistent with the record. It follows that the legal interests to be represented by

- 11 -

Section 2313(a) counsel — which, again, are synonymous with the child's preference, were not ascertainable during the termination proceedings. . . .

* * *

Such a circumstance does not negate the mandate of Section 2313(a) that counsel be appointed to "represent the child" in contested TPR proceedings. It does, however, bear on the question of whether a conflict arises if the trial court allows the attorney-GAL to fulfill that mandate. As a matter of sound logic, there can be no conflict between an attorney's duty to advance a subjective preference on the child's part which is incapable of ascertainment, and an attorney's concurrent obligation to advocate for the child's best interests as she understands them to be. Thus, we conclude that where an attorney-GAL is present in such proceedings undertaking the latter task (advocating for the child's best interests), Section 2313(a) does not require the appointment of another lawyer to fulfill the former (advancing the child's unknowable preference).

* * *

[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed "to represent the child," 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings.

*T.S.*, 192 A.3d at 1089-90, 1092-93 (footnotes and some citations omitted).

Here, the record reflects that the trial court appointed Attorney Williams as Child's GAL and legal counsel. *See* Order Appointing Counsel, DP-905-2021, 9/9/21. In the absence of a conflict between Child's best interests and legal interests, Attorney Williams could have acted in a dual capacity on Child's behalf. *See K.M.G.*, 240 A.3d at 1224, 1235-36. As noted previously, the record indicates that Child was two years and three months old at the time of

the termination hearing, and that Child is capable of some speech because Child addresses Foster Mother as "mom" and "mom-mom." **See** N.T., 12/12/23, at 137. Additionally, both Mr. McNichol and Mother testified that Child cried for between five and twenty minutes during Mother's supervised visitation with Child. **See id.** at 130, 156. Mother also testified that after Child calms down, she is playful and affectionate with Mother. **See id.** at 156. However, there is no evidence in the record to indicate that Child is capable of expressing any preference as to the outcome of the termination of parental rights proceedings. Therefore, we conclude that the although the trial court failed to make a determination on the record[7] that Child is too young for the GAL to have ascertained her preference as the outcome of the proceedings, the presumption from **T.S.** applies and Attorney Williams was able to serve both a Child's GAL and legal counsel. **See T.S.**, 192 A.3d at 1089-90, 1092-93. Therefore, we shall proceed to review Counsel's compliance with **Anders** and **Santiago**.

_____

[7] In **K.M.G.**, we note that Justice Wecht filed a concurring and dissenting opinion, discussing the **T.S.** presumption. Justice Wecht suggested that in termination of parental rights matters where a child is too young to communicate, or otherwise incapable of forming and expressing, a preference as to the outcome, the child's counsel should "detail [their] efforts to glean the child's wishes, whether and to what extent those efforts succeeded, and that they confirmed no conflict, thus making a record that enables appellate review." **K.M.G.**, 240 A.3d at 1251-52 (Wecht, J., concurring and dissenting) (footnote omitted). Although not binding, Justice Wecht's assertion that counsel should detail their efforts to glean a young child's preference, thereby enabling the trial court to maintain a more complete record as to the **T.S.** presumption to facilitate appellate review, merits consideration.

### *Anders*/*Santiago*

When faced with an *Anders*/*Santiago* brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

> To withdraw pursuant to *Anders*, counsel must:
>
> > 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citations and quotation marks omitted).

Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

- 14 -

***X.J.***, 105 A.3d at 3-4 (quoting ***Santiago***, 978 A.2d at 361).

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." ***Id.*** at 4 (citations omitted). Our independent review is not limited to the issue(s) discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. ***J.D.H.***, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it "lacks any basis in law or fact." ***Santiago***, 978 A.2d at 356 (citation omitted).

Instantly, Counsel has filed an application for leave to withdraw that states that he conscientiously reviewed the record and determined that the appeal is frivolous. He has also provided this Court with a certificate of service demonstrating that he served Mother with a copy of his ***Anders***/***Santiago*** brief, application for leave to withdraw, and a letter advising Mother of her right to retain new counsel or proceed *pro se* or and the right to raise any additional points that Mother deemed worthy of consideration. Additionally, Counsel's ***Anders***/***Santiago*** brief provides a summary of the essential facts and procedural history of the case. Counsel also sets forth his reasons for concluding that Mother's appeal is frivolous. For these reasons, we conclude that Counsel has substantially complied with the technical requirements set forth above, and we proceed to an independent review of Counsel's assessment that the appeal is frivolous because there was sufficient evidence to terminate Mother's parental rights. ***See X.J.***, 105 A.3d at 4.

**Section 2511(a)(2)**

Our standard of review in this context is well-settled:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re H.H.N.*, 296 A.3d 1258, 1263 (Pa. Super 2023) (citing *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)); *see also In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (explaining that "the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citation omitted)).

Termination of parental rights is governed by § 2511 of the Adoption Act[, 23 Pa.C.S. §§ 2101-2938]. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach. If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. [*T.S.M.*, 71 A.3d at 267].

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (some citations omitted and some formatting altered); *see also Q.R.D.*, 214 A.3d at 239 (explaining that

if "the court determines the parent's conduct warrants termination of his or her parental rights, the court then engages in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child" (citation omitted and formatting altered)).  We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights.  ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.  The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

> *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted).

> Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [*A.L.D.*, 797 A.2d at 340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (some citations omitted and formatting altered).

Here, the trial court explained:

With regard to [Section 2511(a)(2),] it indicates, "the repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his or her physical and mental well-being and the conditions and cause[s] of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent."

[M]other in this case is in no better position to be reunified with [C]hild today than she was at the time that [C]hild was taken into care.

Mother has not demonstrated any ability to maintain stability of her mental health or stability of her life or stability of being able to have this child in a safe environment. Mother has exercised poor judgment in her decisions throughout the life of this case. She has been — she has had jobs, but she's not had the same job. She's been evicted and through the eviction process twice. And the housing that she elected to go to as pointed out today she elected to move into a house where someone was known to be a drug dealer. She never got the first house she moved into in York up to livable conditions nor the second house up to livable conditions.

I don't believe that any additional time would show that this could be remedied. There's no expected release date for her from prison.

The uncontradicted testimony was that she [was] 302'd. That wasn't refuted by [Mother] . . . .

[Mother] hasn't demonstrated that she can consistently stay in mental health. While she did show some improvement it declined. She has not been in more than moderate compliance for over a year now. She has not progressed [to] more than supervised visits throughout the life of this case. And she hasn't demonstrated that she can remedy this situation which led to this child coming into care as she relapsed into her marijuana use.

I did find Doctor Saleema credible in that Mother at this time does not have the capacity to care for this child and keep this child safe.

N.T., 12/12/23, at 171-72 (some formatting altered).

Following our review, we conclude that the trial court's findings are supported by competent, clear, and convincing evidence in the record, and we find no error in the trial court's legal conclusions. **See H.H.N.**, 296 A.3d at 1263. The record confirms that Mother has made minimal progress with her single case plan objectives during the two-year period in which Child has been in DHS's care. **See** N.T., 12/12/23, at 133, 135. Specifically, Mother has failed to complete parental skills training, maintain consistent employment, maintain adequate housing, or consistently attend mental health treatment. **See id.** at 134-36, 140-44, 147, 148-53; DHS Exhibit 9 at 9; DHS Exhibit 11 at 4-5. Additionally, Mother expressed a desire commit a violent act against DHS by threatening to enter a DHS facility wearing a "bomb vest," and was incarcerated due to criminal charges in two separate matters.[8] **See** N.T., 12/12/23, at 96-97, 132-33, 151; DHS Exhibit 7 at 1 (Mother's public court summary). Further, the trial court credited Dr. Saleema's expert opinion that Mother lacked the capacity to act as a parent to Child at the time of the hearing. **See** N.T., 12/12/23, at 97-98, 101, 122, 172.

Therefore, on this record, we conclude that DHS has established by clear and convincing evidence that Mother has a repeated and continued incapacity, Mother's incapacity has caused Child to be without essential parental care,

---

[8] We recognize that incarceration alone is not sufficient to support termination of parental rights under any subsection of Section 2511(a). **See In re K.M.W.**, 238 A.3d 465, 474 (Pa. Super. 2020). However, "incarceration will certainly impact a parent's capability of performing parental duties, and may render a parent incapable of performing parental duties under subsection (a)(2)." **Id.** (citation omitted and emphasis omitted).

- 20 -

control or subsistence, and the cause of Mother's incapacity cannot be remedied. *See C.M.K.*, 203 A.3d at 262; *see also Z.P.*, 994 A.2d at 1117 (explaining that Section 2511(a)(2) emphasizes a "child's present and future need for essential parental care, control or subsistence necessary for his [or her] physical or mental well-being" (citation omitted)). For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(2). Accordingly, Mother is not entitled to relief on this claim.

### Section 2511(b)

We next review the trial court's conclusion that involuntarily terminating Mother's parental rights best serves Child's developmental, emotional, and physical needs and welfare pursuant to Section 2511(b).

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). We have explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)), *abrogated in part on other grounds by In re K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" *K.T.*, 296 A.3d at 1106 (quoting *T.S.M.*, 71 A.3d at 267). In *K.T.*, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id.* at 1113. Indeed, the *K.T.* Court emphasized that "the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.*

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for

permanency and length of time in foster care[;] whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***K.T.***, 296 A.3d at 1113 (footnote omitted and formatting altered).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

> Here, the trial court explained:
>
> Under [Section 2511(b),] [DHS] has also met its burden by clear and convincing evidence and credible witness testimony. Mother has not been able to progress beyond supervisors of this trial [sic]. [C]hild does not look to Mother to meet any of [C]hild's daily needs.
>
> By contrast [C]hild looks to [Foster Mother] to meet all of [C]hild's needs. [C]hild refers to [Foster Mother] as her mom-mom and her mom. And [C]hild is not comfortable even at the beginning of the visits with [Mother] despite this case being open for two years and [Mother] having more than two years of an opportunity to engage in visits with this child.
>
> I find that [C]hild would suffer no irreparable harm if Mother's rights were terminated.

N.T., 12/12/23, at 174-75 (some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights would

best serve Child's developmental, physical, and emotional needs and welfare. *See K.T.*, 296 A.3d at 1113; *T.S.M.*, 71 A.3d at 267.  Mr. McNichol testified that Child looks to Foster Mother for emotional support and to provide for her physical needs.  *See* N.T., 12/12/23, at 137-38.  Child has a parental bond with Foster Mother, who is willing to adopt Child.  *See id.*  Child would cry during Mother's periods of supervised visitation and Mother would have to spend five to twenty minutes calming Child down.  *See id.* at 130, 137.  Mr. McNichol testified that it is very important that Child have a stable home environment and that termination of Mother's parental rights is in Child's best interest, so that Child could be adopted.  *See id.* at 138.  For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(b).  Therefore, Mother is not entitled to relief on this claim.

### Goal Change

Counsel did not address the trial court's order changing Child's permanency goal from reunification to adoption in his *Anders*/*Santiago* brief; nevertheless, we will discuss the goal change order as part of our independent review of the record.  *See J.D.H.*, 171 A.3d at 908; *X.J.*, 105 A.3d at 4.

However, given our disposition affirming the termination decree, any issues pertaining to the trial court's goal change order is moot.  *See In re D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (noting that a challenge to a goal change order on appeal is "moot in light of our decision to affirm the

court's termination decree[]" and "[a]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect" (citing *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002)). Even if this issue were not moot, we would conclude that there is no error or non-frivolous issues relative to the order changing Child's placement goal.

We review decisions changing a placement goal for an abuse of discretion. *In re R.M.G.*, 997 A.2d 339, 345 (Pa. Super. 2010). We have explained:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

The evidence described above supports the trial court's decision to change Child's permanency goal from reunification to adoption. Mother has made minimal progress towards alleviating the circumstances which necessitated Child's original placement with DHS in 2021. Therefore, were we

to reach this issue, we would not find any non-frivolous issues to support Mother's appeal from the order changing Child's placement goal.

For the reasons set forth above, we discern no abuse of discretion or error of law in the trial court's involuntarily termination of Mother's parental rights to Child. Additionally, we have conducted an independent review of the record and conclude that Mother's appeal is frivolous and that Counsel has not overlooked any additional, non-frivolous issues.

For these reasons, we grant Counsel's petition to withdraw, affirm the decree terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b), and dismiss as moot Mother's appeal from the order changing Child's permanency goal to adoption.

Decree affirmed. Appeal from the order changing the placement goal is dismissed as moot. Counsel's petition to withdraw is granted. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/10/2024